Stephen D. Weisskopf (SBN 213596)
sweisskopf@levatolaw.com
LEVATOLAW, LLP
2029 Century Park East, Suite 400
Los Angeles, California 90067
Telephone: (310) 734-2026

Attorneys for Plaintiff
SPINTOUCH, INC.

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SPINTOUCH, INC., a California corporation,<br><br>             Plaintiff,<br><br>        vs.<br><br>OUTFORM, INC., a Delaware Corporation; ARIEL HAROUSH, an individual, and DOES 1-10,<br><br>             Defendants. | Case No.: 8:21-cv-00840-DOC-ADS<br><br>**SECOND AMENDED COMPLAINT FOR:**<br><br>1. **INTENTIONAL MISREPRESENTATION;**<br>2. **NEGLIGENT MISREPRESENTATION;**<br>3. **VIOLATION OF BUSINESS & PROFESSIONS CODE SECTION 17200;**<br>4. **VIOLATION OF BUSINESS & PROFESSIONS CODE SECTION 17500;**<br>5. **BREACH OF CONTRACT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff spinTouch, Inc. ("spinTouch") hereby complains and alleges as follows:

## SUMMARY OF ACTION

1. Defendant Outform, Inc. ("Outform") engaged in blatantly fraudulent conduct in an effort to profiteer during the COVID-19 pandemic, including conduct by its CEO. Outform manufactures a temperature monitoring kiosk that it claims could quickly and accurately determine an individual's body temperature. Outform marketed the product to businesses, schools and employers stating that its product would create peace of mind and a sense of trust and safety for people engaged in public activities during the COVID-19 pandemic. Outform went so far as to state that its product would help flatten the curve because it could accurately measure body temperature such that individuals with a fever did not enter a business, school or place of employment.

2. The core component of Outform's product and its above claims was an allegedly world-leading German technology sensor manufactured by Heimann Sensor GmbH, equipped with the model, HTPA 32x32d, capable of 32x32 pixel resolution, delivering industry leading accuracy for body temperature screening. The sensor, however, was not manufactured by Heimann and more importantly the sensor included in the product had a single dot 1x1 pixel resolution, which (as explained below) renders the product incapable of accurately measuring body temperature, something Outform knew, but hid from Plaintiff and others.

3. Outform took advantage of a global pandemic to sell a worthless product to unsuspecting businesses, schools,  employers and resellers like spinTouch who Outform knew would rely on the product to protect the safety of their customers, employees and students. Such reckless and irresponsible conduct could only exacerbate the pandemic, not flatten the curve as Outform so cavalierly stated. This type of profiteering during a pandemic is inexcusable and deplorable.

## PARTIES

4. SpinTouch is a California corporation, with its principal place of business in Irvine, California.

5.    SpinTouch is informed and believes, and thereupon alleges, that Outform is a Delaware corporation with its principal place of business in Miami, Florida.

6.    SpinTouch is informed and believes, and thereupon alleges, that Ariel Haroush is an individual who resides in Miami, Florida.

7.    The true names or capacities, whether individual, corporate, associate, or otherwise, of Defendants DOES 1 through 10, inclusive, are unknown to spinTouch, who therefore sues such Defendants by such fictitious names.  SpinTouch will seek leave to amend this Complaint to show their true names and capacities when same have been ascertained.

8.    SpinTouch is informed and believes, and thereupon alleges, that at all times herein relevant, each of the Defendants, including the Doe Defendants, was either an agent, representative, partner, successor in interest, alter ego and/or joint venture of the other Defendants and that each of said Defendants either participated in, planned, authorized, ratified, adopted and assisted in, conspired in, or acted as an accomplice to, one or more of the various acts, omissions, and agreements alleged herein, or is otherwise legally responsible therefor.

**VENUE**

9.    Venue is proper in the Court because many of the acts giving rise to the claims occurred in this county, Outform contracted to perform an obligation in this county, those contracts were entered into in this county, and this county is where the obligations on those contracts were incurred.

**FACTUAL ALLEGATIONS**

10.    SpinTouch has been in the interactive digital signage industry for the past 12 years, specializing in consulting, software development, hardware provider and content creation for innovation spaces, events, trade shows, and sales offices nationwide.

11.    In May 2020, based on feedback from many of spinTouch's partner vendors and internal research, spinTouch decided to add a new product to its offerings, a temperature scanning kiosk.  Given the COVID-19 pandemic, spinTouch realized that such

a product would be tremendously useful to a broad range of industries.

12.    A temperature scanning kiosk is a contact-free and automated device that checks an individual's temperature to determine whether he or she has a fever.  These devices have been used by businesses during the COVID-19 pandemic to screen individuals before they are allowed to enter the business.  These kiosks use infrared technology or laser thermometers to read an individual's body temperature.  This is done by contactless scanning the forehead and providing a temperature reading within seconds. To use a kiosk, an individual must step within the target range of the device, which is usually 2-3 feet, and the device will provide a temperature reading.

13.    SpinTouch, with its background in the interactive digital signage industry, was perfectly positioned to offer a solution that would use displays and sensor technologies to detect approaching individuals and quickly determine their temperature. With the growing needs for businesses to re-open, SpinTouch saw there was significant national demand in the market to warrant a sizable investment and pivot the business to focus on this new product line.  It was also understood that the window of opportunity was expected to be temporary based on the management and reduction of COVID cases.

14.    SpinTouch did not intend to manufacture the kiosk, rather to purchase the product from an existing manufacturer.  After a review of a number of different suppliers, both domestically and internationally, spinTouch elected to work with Outform.  The specific product spinTouch chose was Outform's Gen 1 iDISPLAY Thermometer (the "iDISPLAY Thermometer").

15.    The most important component of the iDISPLAY Thermometer is the thermal sensor.  Being that the product's core function is to determine a human body temperature, the thermopile sensor hardware was the main component that would translate the physical world into thermal data for the software of the tablet to compute and display as an accurate temperature reading on the display and log reports.  Another important component is the software.  The custom software would allow for critical functions like determining if a live person was in front of the display, generating contact tracing log

reports, facial recognition to identify individuals, email alerts, printer functionality, cloud dashboard management, and security integrity of the data.

16.     Before making this decision, however, spinTouch had conversations with Outform about its product and conducted a detailed review of the marketing and advertising materials regarding the iDISPLAY Thermometer, which included the product specifications.

17.     On May 12, 2020 the owner of spinTouch, Pouya "Paul" Hashemi, had a telephone conversation with a sales manager from Outform, Issac Bachar.  Mr. Hashemi wanted to learn more about the iDISPLAY Thermometer and had questions regarding some of its features and the representations about the accuracy of the product.  One such representation is that the product could accurately measure body temperature within 0.54 degrees Fahrenheit, which far exceeded the industry average.

18.     Mr. Bachar confirmed the accuracy representation and stated that their product was superior to their competitors in this respect because Outform's sensors were "the best" and were very accurate.  In addition, that the accuracy representation was based on internal testing by Outform.  Further, Mr. Bachar indicated that in a matter of months they had sold thousands of units and could not keep them in stock, indicating to Mr. Hashemi that it was an accurate and reliable product.

19.     That same day, Mr. Bachar sent Mr. Hashemi an email with a link to the pricing, marketing and advertising materials for the iDISPLAY Thermometer, containing detailed information about the product's specifications.  (*See* Exhibit A attached hereto.)

20.     As part of his research and investigation into which product to buy, Mr. Hashemi clicked on the link and closely reviewed the information about the iDISPLAY Thermometer.  Mr. Hashemi relied heavily on the information contained in the advertising and marketing materials in deciding to purchase the iDISPLAY Thermometer, as opposed to another temperature kiosk manufactured by one of Outform's competitors.

21.     Outform's marketing and advertising materials heavily touted its effectiveness and trustworthiness.  Outform specifically and repeatedly highlighted the key

component of the product, the thermal sensor, representing that the iDISPLAY Thermometer was backed by the world's leading German technology in infrared thermopile arrays manufactured by a company called Heimann.  To illustrate, the following representations were made:

- "Outform's iDISPLAY Thermometer is designed to instill a sense of trust and safety in people across industries as they re-commence everyday activities, and public gatherings post COVID-19."

- "As we continue to find innovative ways to do our part in flattening the curve, Outform's non-contact infrared thermometers will enable our customers to invite users back in stores, schools, and work, in a cost-effective, efficient, and safe way."

- "Backed by the world's leading German technology in infrared thermopile arrays known as the Heimann Sensor, iDISPLAY Thermometer is a touchless, frictionless, and accurate method to temperature measurement."

- "THERMAL IMAGING POWERED BY HEIMANN SENSOR.  Backed by the world's leading technology in infrared thermopile arrays known as the Heimann Sensor, iDISPLAY Thermometer can recognize and capture different levels of infrared light to accurately and rapidly detect temperature."

22.     The advertising and marketing materials identified "Key Features" of the product, wherein Outform again touts the Heimann sensor, stating that the product contains "The world's leading German technology in infrared thermopile arrays, the Heimann Sensor can recognize and capture different levels of infrared light to accurately and rapidly detect temperatures of users within two feet of the Thermometer."

23.     Under the "Technical Specifications," Outform again identifies the sensor as being manufactured by Heimann.  Moreover, that the sensor had a thermopile array with 32x32 pixels.  This representation was of particular importance to spinTouch and relied on in choosing the iDISPLAY Thermometer.

24.     The number of pixels directly correlates to the effectiveness and accuracy of the product's ability to separate an individual's forehead zone from all other items in the sensor's field of view, so that it can measure body temperature.  A product with a low pixel count is not able to accurately measure body temperature.  The greater the pixels the greater the accuracy and effectiveness.  A product with 32x32 pixels is likely to have the accuracy and effectiveness advertised by Outform.

25.     SpinTouch also relied heavily on the fact that it contained a German manufactured sensor.  Germany has long been considered a world leader in engineering and German products carry a certain cache that makes them highly marketable and respected by the consuming public.

26.     The technical specifications also contain a representation that the iDISPLAY can measure body temperature within +/- 0.54 degrees Fahrenheit.  Again, this was a representation that spinTouch relied on heavily in deciding to purchase the iDISPLAY Thermometer, which turned out to be false and, in turn spinTouch made the same representation to its clients.

27.     Additional product specifications that turned out to be false, but were unknown to spinTouch, include, but are not limited to, the following:

- Advertised that the CPU was a "RK3288 quad-core Cortex-A18" when it included a RK3288 Cortex-A17, an inferior CPU.

- Advertised that the internal memory was 16GB when it was 8GB.

- Advertised that the operating system was Android 7.1 when it was Android 5.1, an older version with more security vulnerabilities.

- Advertised that it would measure temperatures from up to three feet away from the product, which it could do, but the measurements were completely inaccurate.

- Facial recognition rarely functioned correctly.

- Did not allow for any remote management or data capture.

- Did not store attendance records, no logs generated.

- No automatic ticket dispenser "Printer" capability.
- Changing the default security code would lock up the system.
- No security card access option.
- No "Analytics/SDK".
- No functioning API.
- Did not support cloud management.
- No "Optional NFC For Secure Entrance Area."

28.     As evidenced above, Outform's product was not as advertised, but spinTouch had no way of knowing about Outform's duplicitous conduct.  At the time of purchasing the iDISPLAY Thermometers, spinTouch believed that the product contained the hardware and software contained in the advertising and marketing materials and could perform as represented.

29.     Indeed, much like buying a smartphone or tablet, the manufacturer identifies the technical specifications of the product, such as the speed of the processor, manufacturer of the chipset, the size of the hard drive, the RAM, etc.  The customer has no way of determining if the product actually meets those specifications because those components are internally housed in the product.  Indeed, even if the product has inferior components, it will still function, and the user may never be the wiser.  Unless the product is opened, and the components inspected or evaluated by an expert there would be no way to know of the deception.

30.     Between May 13, 2020 and May 27, 2020, before discovering any problems with the product, and based on the verbal and written representations regarding the product, spinTouch purchased 425 iDISPLAYs (with spinTouch's branding on the product).  SpinTouch also purchased stands for the product.  But for the misrepresentations in Outform's marketing and advertising materials intended for the public, spinTouch would not have made these purchases (i.e., spinTouch was fraudulently induced).

31.     On May 26, 2020, spinTouch also ordered a single unit for itself so that it could invest in creating its own advertising and marketing materials for the product and

also use the product so that it could more effectively sell the product to customers and answer any questions they might have.

32.     It was also agreed that Outform would provide SpinTouch with many of the marketing materials to help scale the promotional efforts and quickly take pre-orders on the product line prior to receiving the first batch of units.  Specifically, Outform also agreed to provide the marketing materials (i.e., the specifications), which it knew spinTouch intended to provide to its potential customers.

33.     On May 19, 2020, Outform provided SpinTouch with a marketing video custom designed to remove the iDISPLAY branding and include SpinTouch's logo watermark.  The video specifically stated that the product contained (i) "Thermal imaging powered by Heimann chip"; (ii) showed the device working with a Zebra brand printer; and (iii) throughout the video showing color-controlled light up stands.  These were misrepresentations  unknown to spinTouch at the time.

34.     On June 1, 2020, Mr. Hashemi had a video call with the CEO of Outform, Ariel Haroush (the "CEO") and Mr. Bachar.  On this video call, the CEO touted his company by emphasizing that it owns its own factories.  As such, Outform has much more control over product specifications and quality assurance testing prior to product being shipped out.  This also meant that Outform knew exactly what hardware and software were in its product since it sourced and installed such in every product.  The CEO stated that his company's products were superior to their competitors and stated that they sold to companies such as Apple, Amazon and Hard Rock.  He claimed to already have sold over 13,000 iDISPLAY Thermometers in just the early months of the pandemic.  The CEO specifically represented that the iDISPLAY Thermometers contained a Heimann sensor with 32x32 resolutions.   His statements about sensor were consistent with the marketing materials previously provided to Mr. Hashemi.  Further, he discussed the benefits of the Heimann sensor and how the multi point thermopile array technology determines forehead temperature so precisely by taking multiple points on the forehead and averaging the results, which is how the sensor had an accuracy level in excess of its competitors.

Further, that the Heimann sensor is in very high demand and the company had purchased 10,000 sensors for use in the iDISPLAY Thermometer. Unknown to spinTouch at the time, these were all lies designed to induce spinTouch to purchase more iDISPLAYs. As the manufacturer of the product, the CEO knew that it was not using Heimann sensors and that the sensors it was using had 1x1 pixel resolution, not the 32x32 resolution advertised.

35.     At or around the time of this video call, Mr. Hashemi visited the LinkedIn webpage for Mr. Haroush to further research the company and the iDISPLAY Thermometers before making additional purchases. Mr. Haroush had a video posted on his LinkedIn webpage that was publicly available and intended to market and advertise the iDISPLAY Thermometer to potential customers. That video, among other things, touted that the iDISPLAY Thermometers contained the German Heimann sensor, which it did not. At this same time, Mr. Haroush had a post on his LinkedIn webpage touting the quality of the product stating "No shortcuts! Outform takes all measures to ensure the quality of the iDISPLAY Thermometer. Radiated Emission Test. Don't settle for less." This public statement to potential customers was misleading for all the reasons mentioned above. Mr. Hashemi relied, in part, on this video and the posts on Mr. Haroush's LinkedIn webpage to enhance his purchase of the iDISPLAY Thermometers.

36.     On June 4, 2020, without any request from spinTouch, Mr. Bachar sent Mr. Hashemi updated advertising and marketing materials for the iDISPLAY Thermometers. (S*ee* Exhibit B attached hereto.) Some of the specifications had changed from the earlier materials. Specifically, the internal memory had decreased from 16GB to 8GB. The operating system had been downgraded from Android 7.1 to Android 5.1. Further, the sensor was no longer from just Heimann, instead it stated the sensor was from either "Heimann/Melexis/Omron." Of significance, the sensor was still a 32x32 thermopile array. Mr. Hashemi notified Mr. Bachar of these discrepancies by email dated June 4, 2020. Mr. Bachar did not respond to the email.

37.     However, later that day the two had a telephone conversation wherein Mr. Bachar indicated that he did not know why the materials were updated but assured Mr.

Hashemi that the device would still perform as advertised because it contained the high thermal resolution of 32x32 pixels and the accuracy was still rated at +/- 0.54°F, as the new brochure still outlined.

38.     In hindsight, this telephone conversation was the beginning of Outform's deliberate attempts to mask the misrepresentations in the advertising and marketing materials by making outright misrepresentations and attempting to shift blame and focus from its product to other issues.  Specifically, that any problems with the product were from, for example, misuse or could be fixed by a software patch, and never once telling spinTouch that the problems were incurable because the product only had a 1x1 single pixel resolution.

39.     The individual unit spinTouch ordered for itself arrived on June 3, 2020. Shortly thereafter, in demoing the unit, spinTouch noticed problems with the iDISPLAY Thermometer, which included, but were not limited to, the following:

- The temperature accuracy was well above the advertised +/- 0.54°F.
- The temperature readings were consistently either 97.7°F, 97.9°F or 98.1°F regardless of the person's actual temperature.
- The device consistently missed a warmed-up forehead of 101°F to 103°F, which would be a typical forehead surface temperature for a person exhibiting a fever.
- Only way to trigger a high temperature was if the user placed a 120°F hot water bottle in front of their face, which is a nonexistent temperature for a human forehead to ever reach, even with an extreme fever.
- A high level of false positive alerts when the person exhibited no elevated surface temperature.
- The email alert was not functioning.
- No cloud dashboard management was available.
- Multiple languages were not supported.
- Automatic Ticket Dispenser "Printer" function was not available.

40.     SpinTouch informed Outform of these problems and missing features by email and during telephone calls.  Outform downplayed everything.  Originally, Outform stated that they had never seen such issues before and that it was just a software glitch with spinTouch's individual unit that could be fixed with a software update.  Again, this was a ruse designed to mislead spinTouch because Outform knew that the accuracy problems were the result of the thermal sensor.

41.     Outform sent software patches on June 9, 2020, new device firmware and additional software on June 11, 2020, and again a new software on July 2, 2020, but none resolved the issues.

42.     By this point, spinTouch had sold approximately 250 units and its clients started to receive the units on June 12, 2020.  Almost immediately, clients started to complain about the same accuracy issues and missing features.  Outform's initial response was to blame environmental factors, then that changed to some units having bad software that needed to be updated and finally Outform stated that some units may be defective. Outform continued to advise that these were correctable issues so spinTouch sent its customers the software patches and also replaced devices with new Gen1 units.  In doing so, spinTouch incurred additional costs, such as shipping costs, as well as costs to investigate and document the issues regarding the product.

43.     Despite all this, Outform never advised or even suggested that the sensor could be the problem and that the product had a single dot 1x1 pixel sensor and not the 32x32 thermopile array sensor advertised.  SpinTouch remained ignorant of this fact and trusted the representations made by the CEO and others at Outform.

44.     On June 22, 2020, during a Zoom call, Mr. Bachar offered to upgrade the next batch as well as future orders to their new Gen2 version, which they claimed had all previously mentioned issues already resolved.  On the same day, he sent an email with an attachment that outlined the hardware changes between the Gen1 and Gen2 models, which had no mention of the sensor.  During that call, Outform reassured spinTouch, as well as a handful of proceeding conversations, that the Gen2 devices would arrive on time and were

a significant improvement in both hardware and software.

45.     Mr. Bachar also repeatedly advised in telephone conversations during late June and early July that spinTouch should feel confident in continuing to advertise the product and take new orders as it saw no possible issues arising with their new line of Gen2 thermometers, based on the feedback he was receiving from his quality assurance and engineering teams.  Mr. Bachar knew that spinTouch was spending considerable money on advertisements based on these representations.

46.     On July 14, 2020, Outform indicated again that they tested each unit and Ronen Simhi, who represented himself as the lead engineer (but whose title was General Manager), assured spinTouch they would specifically test to make sure the temperature readings were fluctuating as they should, and he sent handwritten individual test results by his quality assurance team.

47.     Based on that advice and those representations, spinTouch continued to market the product and spend more resources and money on obtaining new sales in this very competitive industry, and it continued to put its goodwill and reputation on the line for the product.

48.     Due to large orders coming in, and Outform and its CEO's representations and confidence in the product, spinTouch placed two new orders on or about June 23, 2020 and July 7, 2020, totaling 1,000 Gen2 units.  But for the misrepresentations in Outform's marketing and advertising materials intended for the public, Mr. Haroush's verbal misrepresentations and the misrepresentations in the video and posts on Mr. Haroush's LinkedIn webpage, spinTouch would not have made these additional purchases (i.e., spinTouch was fraudulently induced).

49.     SpinTouch ultimately paid approximately $515,000 for these products and their logistic costs.

50.     On July 13, 2020, after spinTouch completed its last orders, and the first Gen2 units started arriving to clients three weeks past the delivery expectation, Mr. Bachar sent spinTouch another updated set of marketing and advertising materials stating for the

first time that the sensor was manufactured by Omron, an Asian manufacturer, which was not a German sensor that Outform had so heavily marketed in its original materials, by its CEO, as well as social media and online advertising.  Mr. Hashemi responded to Mr. Bacher asking why he was sending updated specs at this time, and he never responded.

51.     Not long after the Gen2 units arrived with customers, the complaints began again.  Although a couple of the features were now resolved, many of the key components were still riddled with bugs.  Moreover, the units still did not accurately measure body temperature to any level of reliability.

52.     SpinTouch spent an exorbitant amount of time and money investigating the issues which included scheduling countless in-depth late evening meetings with Outform's overseas team of engineers, following constantly changing troubleshooting guides, handling client complaints, reshipping replacement devices; testing the devices in multiple scenarios, producing detailed documentation and videos for troubleshooting, recording hours of live scan videos, and maintaining client feedback logs.  With the misinformation that the problem was isolated to the algorithm and software, spinTouch went above and beyond by taking several days and creating detailed reports and charts from hundreds of internal scans with different conditions and a variety of physically heated foreheads to illustrate the specific areas of the inaccuracies in the readings.  All of this was provided to Outform's engineers in the hope of resolving the issues as quickly as possible.  Despite all this, rather than informing spinTouch of the true problem in the devices (i.e., the thermal sensor), Outform misled spinTouch with false statements that problems were originating from user error, incorrect settings, isolated device defects, environmental factors, client over expectation, or poor installations, which only frustrated spinTouch's clients further and cost it additional resources as Outform stalled to provide accurate factual information.

53.     All of this investigation cost spinTouch tens of thousands of dollars.

54.     On July 14, 2020, the CEO sent Mr. Hashemi two emails wherein he claimed that Outform tested the latest updates and the temperature accuracy and fever detection feature all worked fine.  Further, he touted the Gen 2 product stating it is a "strong

product" that Outform is confident "will meet expectations."  Again, no mention of the sensor.

55.     On July 17, 2020, Mr. Hashemi had a telephone call with the CEO, wherein he claimed that Outform recently invested more than $50,000 in extremely sensitive and advanced thermal testing equipment and would quickly solve this small software bug. Again, the CEO made no mention of the fact that the iDISPLAY Thermometer only had 1x1 pixel resolution, not the 32x32 thermopile array pixel resolution advertised, and that this was likely the primary, if not exclusive, cause of the problems.

56.     On July 19, 2020, the CEO, in an email to Mr. Hashemi, was still representing that the issues were a software problem and that he was directly involved in attempting to resolve the problem, stating "I'm getting on a call with the team tonight and I will provide in [sic] update Monday morning.  We understand your frustration, but software debugging is not accurate science."

57.     In hindsight it is apparent that the CEO was the ringleader of the lies and deception being perpetrated by Outform, from the advertising and marketing materials to the statements being made by Mr. Bacher and others.  The CEO was orchestrating a cover up and fraud to protect Outform's profits and reputation, all to the detriment of spinTouch and more importantly the unsuspecting businesses, schools and employers who relied on the accuracy of the iDISPLAY Thermometer.  Despite claiming in emails that Outform has been transparent, it clearly was anything but.

58.     At one point, Mr. Hashemi pushed back on the CEO about the very real impact to spinTouch from Outform's defective products.  The CEO reacted sharply, accusing spinTouch of falsifying the defects.  The CEO also threatened to stop providing support (in violation of the warranty) and demanded spinTouch take down marketing materials and stop selling the product, not because he believed the product had issues, but to threaten and intimidate spinTouch into backing off its criticism of the product.  The CEO knew that spinTouch was in a vulnerable position because it was sitting on hundreds of units and could ill afford to have Outform shut off support given the number of products

spinTouch had sold and still had in inventory.  The CEO's reaction was unprofessional and uncalled for in light of the circumstances.

59.     On July 24, 2020, Mr. Bachar replied to an email from Mr. Hashemi about the ongoing issues with the temperature readings as well as a number of other missing or defective features.  Mr. Bachar indicated that the Outform team analyzed the temperature reading issues and that the issues are more than likely isolated to spinTouch's specific testing device, stating "We found a way to improve this and the team is working on it these days.  But in general, readings at our end are more accurate. We are using the same hair dryer method to warm up the forehead.  Might be your specific device."

60.     Outform also sent software updates.  However, with minimal quality control. spinTouch would quickly discover the software updates failed to resolve major issues. With repeated failed software patches and replacing client products with more defective units, spinTouch received an avalanche of client cancellations, angry emails, canceled POs, withdrawn partnerships, bad industry press, failed pilot launches for large rollouts, chargebacks, returns and threats of lawsuits.  The reputational damage carried over to spinTouch's other business product offerings, as they had partners inform them that their clients would prefer not to work with spinTouch due to the negative feedback they had received from other companies related to the iDISPLAY Thermometer.

61.     Outform continued to misrepresent the problems by trivializing it as a couple of defective batches, user errors and software glitches that were only a few days away from being fixed.  On countless occasions, Outform specifically claimed a resolution to the temperature inaccuracy issues.  To illustrate, on August 11, 2020, Mr. Simhi stated that "This has been fixed and tested by our team to meet the level of standard we defined. You'll receive a sample soon where you can experience yourself the measuring accuracy". Despite the multiple statements, test logs and videos Outform's team sent over to show the issue had been completely resolved, any lengthy testing would reveal the newly deployed software was designed to further mask the hardware limitations of the single dot pixel sensor and the issues would quickly resurface after a handful of repeated tests.

62.     On September 9, 2020, Mr. Bachar stated that "From our test the device working well without any issue.  I sent you the latest APK for Gen 1 that you can send you client."  Mr. Hashemi specifically referenced the temperature accuracy issues by email dated September 11, 2020 and Mr. Bachar responded, "After improve the APK for Gen 2, we did QA and didn't found any issue with the temperature."  Then, in an email dated September 15, 2020, Mateo Diaz, Outform's Technical Project Lead, stated "Like Isaac has stated our Team has performed tests with both Outform's APK and Spintouch's APK; they have not experienced issues with reading temperature like what is shown on your video."  These were all lies and an attempt to further cast doubt on spinTouch's own internal testing.

63.     At best, spinTouch achieved a temperature accuracy of +/- 3.5°F based on its own testing, not the +/- 0.54°F, which rendered the product useless in determining an accurate human body temperature by any standard, since that could cover a range of 96°F up to 103°F.

64.     It became more apparent that Outform's software was deliberately designed to manipulate the sensor's temperature readings, when a client sent spinTouch a video of them presenting an image of a face on a piece of paper to the device, and the reading coming back with a "Normal temperature" of 98.1°F.  When Mr. Hashemi requested an explanation from Outform on how it's possible a piece of paper is registering a much higher temperature than it should, Mr. Ronen explained "As for the reason why a printed picture can still show a 'Normal Temp', well that's because we limited our device to display a minimum temp level".  However, this explanation does not correspond with the technical specifications of the product, which outline the device has a Temperature Range Detection between 82.4°F to 109.4°F, in addition the device has been shown to scan people with readings as low as 97.7°F.

65.     In attempting to deflect and mislead, Outform would constantly show edited cherry-picked videos that demonstrated the product working accurately with an updated software and blamed spinTouch's setup or user error for the cause of the issue.  As

spinTouch suspected that these test results were altered and could not be replicated live, spinTouch requested to have a zoom video call showing spinTouch the results with live scans.  SpinTouch made such a request on six occasions to Mr. Diaz, twice on September 13, 2020, September 15, 2020, September 20, 2020 and twice on September 23, 2020.  He ignored all these requests, yet he would still respond in between these communications to other questions about the product or features.

66.    Outform claimed none of the devices were defective and the only remedy they offered was to swap out the product for more defective units at spinTouch's expense. Outform never disclosed that the product did not contain the advertised sensor or anything close to it.

67.    SpinTouch ultimately shipped the majority of the unsold units back to Outform, at spinTouch's cost, to be reviewed and tested so that spinTouch could understand the root cause of the issues.  However, Outform has never offered any explanation from their internal testing, even though its CEO claimed he would inform them as soon as they receive the units back.  In an email on August 11, 2020, he stated "If the product is DOA, we will know that once we will get it back and we can confirm if this is the case or not".

68.    Outform's final resolution to this problem was to offer spinTouch Gen3 units to replace the Gen1 and Gen2 units.  Initially, spinTouch did replace some units with Gen3 units, but stopped that practice as its confidence in Outform further eroded and because too much time had passed and the number of units they offered was not enough to replace all of the units out in the field.  Further, spinTouch started to suspect there were systematic problems with the product given that the source of problems with Gen1 and Gen 2 units were never revealed despite repeated requests.  SpinTouch did not want to go through the same nightmare with the Gen3 units.

69.    Ironically, the Gen3 units contained a different thermal sensor, but this was not prominently disclosed, likely because Outform needed to continue to mask its prior fraud with respect to the Gen1 and Gen2 units.

70.     With repeated mentions to Outform's CEO, that spinTouch's reputation was being damaged, expenses to resolve the issues were rapidly growing, lives could be at risk, and time was of the essence, he continued to claim a software bug and user error was the culprit and hid the fact that the temperature reading issues were related to using an inappropriate and incorrect sensor for this specific application.

71.     Due to delays and ineffective resolutions, spinTouch resorted to replacing all Gen1 and Gen2 products for clients that were reporting issues with a product from a different vendor, at spinTouch's cost.  This nearly put spinTouch out of business, as it had to purchase another vendor's devices on a rush order at a higher rate, plus handle the logistics cost and deal with learning and training on the new hardware and software, with no compensation offered by Outform (other than nominal shipping costs and they canceled some of the advance orders).  SpinTouch ended up replacing around 180 Gen1 and Gen2 units with a similar product from a different manufacturer, at its cost.

72.     Doubtful of the claims Outform was making about the product quality and specifications and realizing Outform would not provide any transparent feedback of their internal testing of the defective units that were returned, spinTouch conducted its own examination of the product's internal parts.

73.     Upon opening the device, SpinTouch identified that the sensor in the Gen1 and Gen2 units were not the advertised German Heimann HTPA 32x32d thermopile array sensor.  Instead, the devices contained a significantly lower-end Japanese manufacturer sensor, an Omron D6T-A1-01/02 sensor with 1x1 single pixel resolution.  This is a sensor that is 1,024 times less effective in terms of native pixels than what was shown on the original brochures.  Suddenly, it became apparent that the temperature accuracy issues were caused by this low-end sensor that Outform had installed in the Gen1 and Gen2 units, something Outform knew about from the outset and kept from spinTouch.

74.     Additionally, based on spinTouch's research, the Gen3 devices use a model RQVK002 and 9400N, which is using an 8x8 resolution sensor, which has 93% less pixels than what was shown in their original specifications.

75.     Omron Corporation ("Omron"), which is the manufacture of the thermal sensor that is installed in the Gen1 and Gen2 devices, explicitly states in marketing videos that its single pixel type 1x1 D6T-A1-01/02 sensor, is not to be used for applications involving taking a human temperature from a distance of 1-3 ft.  Since the sensor can only view in one pixel, the device will not be able to determine the difference between the human face and the background, let alone the location of the forehead, and therefore will not be able to get a clear temperature reading of the person's forehead standing directly in front of the device. This can never be achieved to any level of accuracy, regardless of calibrations, troubleshooting guides or special software algorithms that are created for the device, since the device, limited by hardware specification, would not have enough data points to isolate the human forehead from all other elements in front of the device.

76.     At this time, SpinTouch reached out to Omron.  An account representative confirmed that the exact sensor being used in the iDISPLAY Thermometer should not be used for taking human body temperatures from a distance of 1-3 ft away.

77.     Outform knowingly took advantage of a global pandemic for profit, risking the lives of countless people in the process by launching an untested and flawed product whose core purpose was to take accurate human temperature to determine the likelihood of a fever.  Then when questioned about the product's performance, Outform's CEO doubled down on the second generation by reiterating his confidence with their new product, to push spinTouch to continue to still market and offer this new product and exposing more liability and danger to the community.

78.     In acting so recklessly and callously, Outform exposed spinTouch to liability to spinTouch's customers who could sue spinTouch for selling them a defective and falsely advertised product.  Moreover, if any consumer, employee or student of a customer that bought an iDISPLAY Thermometer from spinTouch contracted COVID as a result of the iDISPLAY Thermometer's inability to accurately read body temperature, spinTouch was exposed to the risk of personal injury liability to those third parties.  Outform's fraud had far reaching effects.

79.     SpinTouch's reputation and goodwill was damaged as evidence by the countless complaints it received from customers.  This was compounded by the fact that Outform indicated that the Gen2 units had fixed any problems so spinTouch relied on this representation and replaced over a hundred Gen1 units in the field with Gen2 units.  When those units failed to perform, spinTouch looked even worse in the eyes of its customers.  SpinTouch received emails from existing and prospective customers who had heard that the iDISPLAY Thermometers did not work, which damaged spinTouch's reputation and lead to those customers to cancel purchase orders or cut off discussions about orders.  This also directly impacted spinTouch's other products and will affect the sale of those products on a going forward basis due to the damage to its reputation.

## FIRST CAUSE OF ACTION

### (Intentional Misrepresentation Against Defendants and Does 1-10)

80.     SpinTouch repeats and alleges again each and every allegation set forth above as though fully set forth herein.

81.     Outform's advertising and marketing materials for the iDISPLAY Thermometer approved and authorized by the officers and executives of the company contain blatant misrepresentations regarding the product's specifications to induce spinTouch to purchase the product believing that it was capable of accurately and effectively measuring body temperature, when Outform knew that the product contained an inferior and not-as-advertised sensor that rendered the product ineffective in accurately measuring body temperature.

82.     Outform's verbal representations by its CEO and others also blatantly misrepresented the product's specifications.

83.     Outform and its CEO knew that the representations were false when they made them or made the representations recklessly and without regard for their truth.

84.     Outform and its CEO intended that spinTouch would rely on the representations and omissions.  Indeed, the entire purpose of creating the marketing and advertising materials and making the verbal representations was so that companies such as

spinTouch would read them and rely on them in making purchasing decisions.

85.     SpinTouch reasonably relied on Outform's and its CEO's representations. Indeed, spinTouch had no reason to believe or suspect that the verbal representations and the marketing and advertising materials regarding the iDISPLAY Thermometer were blatantly false.  Outform also touted how many units had been sold in a short period of time, suggesting the product performed as represented.

86.     SpinTouch was harmed above and beyond its expectancy damages under the contract.  SpinTouch incurred, for example, shipping costs to replace Gen1 and Gen2 units; labor hours to investigate the units; the costs of purchasing new products from a different manufacture to replace the Gen1 and Gen2 units for existing customers, and loss of reputation and goodwill.

87.     SpinTouch's reliance on Outform's and its CEO's representations and omissions were a substantial factor in causing its harm.  Moreover, Outform's and its CEO's continued misrepresentations after performance issues were discovered and its claims that issues were fixed caused additional damages to spinTouch.

88.     In committing the acts described herein, the conduct of Outform and its CEO was despicable, and done with malice, oppression and fraud, justifying an award of punitive damages against Outform and its CEO.

## SECOND CAUSE OF ACTION

### (Negligent Misrepresentation Against Defendants and Does 1-10)

89.     SpinTouch repeats and alleges again each and every allegation set forth above, as though fully set forth herein.

90.     Outform's advertising and marketing materials for the iDISPLAY Thermometer approved and authorized by the officers and executives of the company contain blatant misrepresentations regarding the product's specifications to induce spinTouch to purchase the product believing that it was capable of accurately and effectively measuring body temperature, when Outform knew that the product contained an inferior and not-as-advertised sensor that rendered the product ineffective in accurately

measuring body temperature.

91.   Outform's verbal representations by its CEO and others also blatantly misrepresented the product's specifications.

92.   Although Outform and its CEO may have honestly believed that the representations were true, Outform and its CEO had no reasonable grounds for believing the representations were true when they made them.

93.   Outform and its CEO intended that spinTouch would rely on the representations and omissions.  Indeed, the entire purpose of creating the online social media and hard copy marketing and advertising materials and making the verbal representations was so that companies such as spinTouch would read them and rely on them in making purchasing decisions.

94.   SpinTouch reasonably relied on Outform's and its CEO's representations. Indeed, spinTouch had no reason to believe or suspect that the verbal representations and the marketing and advertising materials regarding the iDISPLAY Thermometer were blatantly false.  Outform also touted how many units had been sold in a short period of time, suggesting the product performed as represented.

95.   SpinTouch was harmed above and beyond its expectancy damages under the contract.  SpinTouch incurred, for example, shipping costs to replace Gen1 and Gen2 units; labor hours to investigate the units; the costs of purchasing new products from a different manufacture to replace the Gen1 and Gen2 units for existing customers, and loss of reputation and goodwill.

96.   SpinTouch's reliance on Outform's and its CEO's representations and omissions were a substantial factor in causing its harm.  Moreover, Outform's and its CEO's continued misrepresentations after performance issues were discovered and its claims that issues were fixed caused additional damages to spinTouch.

97.   In committing the acts described herein, the conduct of Outform and its CEO was despicable, and done with malice, oppression and fraud, justifying an award of punitive damages against Outform and its CEO.

**THIRD CAUSE OF ACTION**

**(Violation of California Business & Professions Code Section 17200 (the "UCL"), et. seq. Against Defendant Outform and Does 1-10)**

98.     SpinTouch repeats and alleges again each and every allegation set forth above, as though fully set forth herein.

99.     The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising.  Cal. Bus. Prof. Code § 17200.

100.    The UCL imposes strict liability.  Plaintiff need not prove that Outform intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices – but only that such practices occurred.

101.    A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

102.    Outform's actions constitute "unfair" business practices because its advertising and marketing materials for the iDISPLAY Thermometer contain blatant misrepresentations regarding the product's specifications.  Outform's acts and practices offended an established public policy of transparency in marketing and advertising of products that have a direct impact on health and safety of individuals, and engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious.

103.    The harm to spinTouch outweighs the utility of Outform's practices.  There were reasonably available alternatives to further Outform's legitimate business interests other than the misleading and deceptive conduct described herein.

104.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

105.    Outform's acts and practices alleged above constitute fraudulent business

acts or practices as they have deceived spinTouch and are highly likely to deceive anyone purchasing the iDISPLAY Thermometer.  SpinTouch relied on Outform's fraudulent and deceptive representations regarding the specifications and capabilities of the iDISPLAY Thermometer.  These misrepresentations played a substantial role in spinTouch's decision to purchase the product, and spinTouch would not have purchased the product without Outform's misrepresentations.

106.    Outform's acts and practices alleged above constitute unlawful business acts or practices as they have violated state and federal law in connection with their deceptive pricing scheme.  The Federal Trade Commission's Act ("FTCA") prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and prohibits the dissemination of any false advertisements.

107.    The violation of any law constitutes an "unlawful" business practice under the UCL.

108.    As detailed herein, the acts and practices alleged were intended to or did result in violations of the FTCA and the FAL.

109.    Outform's practices, as set forth above, have misled spinTouch. Consequently, Outform's practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

110.    Outform's violations of the UCL, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that the public will be deceived into purchasing the iDISPLAY Thermometer believing it can accurately read body temperature.  Moreover, there are untold numbers of these units in public use at this time, creating a threat to the health and safety of businesses and school.

## **FOURTH CAUSE OF ACTION**

**(Violation of California Business & Professions Code Section 17500 (the "FAL"), et. seq. Against Defendant Outform and Does 1-10)**

111.    SpinTouch repeats and alleges again each and every allegation set forth above, as though fully set forth herein.

112.    Cal. Bus. & Prof. Code § 17500 provides:

It is unlawful for any…corporation…with intent…to dispose of…personal property…to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated…from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement…which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading….”

113.    The “intent” required by Section 17500 is the intent to dispose of property, and not the intent to mislead the public in the disposition of such property.

114.    Outform’s practice of intentionally misrepresenting the specifications and capability of the iDISPLAY Thermometer, was an unfair, untrue, and misleading practice. This deceptive marketing practice gave spinTouch the false impression that the product could perform as advertised, when it could not.

115.    Outform misled spinTouch by making untrue and misleading statements and failing to disclose the true specifications and capabilities of the product.

116.    As a direct and proximate result of Outform’s misleading and false advertisements, spinTouch suffered injury in fact and has lost money.  As such, spinTouch requests that this Court order Outform to restore this money to spinTouch, and to enjoin Barneys from continuing these unfair practices in violation of the FAL in the future. Otherwise, spinTouch and other customers will be irreparably harmed and/or denied an effective and complete remedy.

### FIFTH CAUSE OF ACTION

### (Breach of Contract Against Defendant Outform)

117.    SpinTouch repeats and alleges again each and every allegation set forth above, as though fully set forth herein.

118.    In May 2020, SpinTouch originally entered into an oral or implied-in-fact contract with Outform for the purchase of iDISPLAY Thermometers.  SpinTouch agreed

to pay and did pay $141,115 in exchange for 426 iDISPLAY Thermometers and accessories.  In addition to the quantity and cost of the units, the parties agreed that the iDISPLAY Thermometers would have the features and functionality contained in the product specifications that are attached hereto as Exhibit A.  That included, but is not limited to:

- A German infrared thermopile array sensor, specifically, a Heimann HTPA32x32d sensor (with 32x32 pixel resolution);
- An accuracy level of between +/- 0.54°F;
- Measurement distance of 0.3-0.8 Meters;
- Temperature range detection between 82.4 F to 1094 F
- RK3288 quad-core Cortex-A18 CPU;
- 16GB of internal memory;
- Android 7.1 operating system;
- IP54 Protection level;
- Remote management and data capture;
- Ability to store staff members with facial recognition;
- Ability to generate details contact tracing logs;
- Automatic ticket dispenser "Printer" capability;
- Security card access option;
- "Analytics/SDK";
- "Optional NFC For Secure Entrance Area."
- Email alerts;
- Cloud dashboard management;
- Multiple language capacity;

119.   Outform breached the contract by failing to provide any of the above features and functionality in the iDISPLAY Thermometers spinTouch purchased.

120.   SpinTouch did all, or substantially all, of the significant things that the contracts required it to do, namely, pay Outform for the products.

121.   Outform failed to provide iDISPLAY Thermometers with the specifications and capabilities contained in the advertising and marketing materials, as provided herein.

122.   SpinTouch was harmed.

123.   Outform's breach of contract was a substantial factor in causing spinTouch's harm.

124.   In June and July 2020, SpinTouch entered into a second oral or implied-in-fact contract with Outform for the purchase of iDISPLAY Thermometers.  SpinTouch agreed to pay and did pay $510,785 in exchange for 1026 iDISPLAY Thermometers, accessories and logistics.  In addition to the quantity and cost of the units, the parties agreed that the iDISPLAY Thermometers would have the features and functionality contained in the product specifications that are attached hereto as Exhibit B.  That included, but is not limited to:

- Infrared thermopile array sensor;
- A Heimann/Melexis/Omron w/ 32x32 pixel resolution sensor;
- An accuracy level of between +/- 0.54°F;
- Measurement distance of 0.3-0.8 Meters;
- Temperature range detection between 82.4°F to 109.4°F
- RK3288 quad-core Cortex-A18 CPU;
- IP54 Protection level
- Remote management and data capture;
- Ability to generate detailed contact tracing logs (delayed);
- Automatic ticket dispenser "Printer" capability (delayed);
- Security card access option;
- "Analytics/SDK";
- "Optional NFC For Secure Entrance Area";
- Email alerts (delayed);
- Cloud dashboard management (delayed);
- Multiple language capacity;

125.    Outform breached the contract by failing to provide any of the above features and functionality in the iDISPLAY Thermometers spinTouch purchased.

126.    SpinTouch did all, or substantially all, of the significant things that the contracts required it to do, namely, pay Outform for the products.

127.    Outform failed to provide iDISPLAY Thermometers with the specifications and capabilities contained in the advertising and marketing materials, as provided herein.

128.    SpinTouch was harmed.

129.    Outform's breach of contract was a substantial factor in causing spinTouch's harm.

## **PRAYER FOR RELIEF**

WHEREFORE, spinTouch prays as follows:

1.    For general and special damages;

2.    For restitution and disgorgement from Outform only of all profits and unjust enrichment that Outform obtained from spinTouch as a result of its unlawful, unfair, and fraudulent business practices described herein;

3.    For punitive damages;

4.    For prejudgment interest;

5.    For costs of suit; and

6.    For any such other and further relief as the Court deems just as proper.

DATED: December 1, 2021                    LEVATOLAW, LLP


                                                          /s/ Stephen D. Weisskopf
                                                          Stephen D. Weisskopf
                                                          Attorneys for Plaintiff
                                                          SPINTOUCH, INC.

### JURY TRIAL DEMAND

SpinTouch hereby demands a trial by jury of all issues which are subject to adjudication by a trier of fact.


DATED: December 1, 2021                    LEVATOLAW, LLP


                                           /s/ Stephen D. Weisskopf
                                           Stephen D. Weisskopf
                                           Attorneys for Plaintiff
                                           SPINTOUCH, INC.